Commonwealth of Pennsylvania *v.* James Roddy and John Roddy, Appellants.

*Criminal law—Murder—Challenge of jury—Opinion of juror.*

The Supreme Court will not reverse a conviction in a murder case because the trial judge overruled a challenge for cause, where it appears that the challenged juror stated on his voir dire that he had been present as a spectator at a previous trial; that he had heard part of the commonwealth's evidence, and had read such summaries of the evidence as were published in the local papers, and from that had formed and expressed an opinion against the prisoner, but that his opinion was provisional, and it would not prevent him from rendering a verdict in accordance with the evidence submitted.

*Criminal law—Murder—Evidence.*

On the trial of an indictment for murder where the evidence showed that the murdered man had been tied with straps; that the murderers had ridden from the scene of the murder on horses belonging to a tenant of the deceased, and had abandoned the horses several miles from the deceased's house, on a road leading to the prisoner's house, it is proper to admit evidence of the tenant that he discovered on the morning after the murder that his barn had been broken open during the night; that a pair of horses, a couple of bridles and a saddle had been taken away, and that the straps with which the deceased had been bound were taken from his fly nets.    This testimony was relevant as explanatory of the facts which were before the jury, and as tending to show by what route the murderers fled, and how it was possible for the defendants to have been seen so early next morning where, in the attempt to establish an alibi, their witnesses had placed them, consistently with the theory that they were the murderers, and as showing deliberation, and as a part of the history of the crime.

On the trial of an indictment for murder evidence is admissible that, prior to the murder the deceased had in his possession a ten dollar confederate note, and that on the day after the murder the prisoner had in his possession a note similar in appearance, and of the same denomination,

which was carefully destroyed by him, in connection with the prisoner's declaration as to how he came by the note, and why he destroyed it.

*Criminal law—Murder—Evidence—Dying declarations—Necessity for their admission.*

The dying declarations of a person who has been mortally injured, as to the origin of his injuries and the person at whose hands he has received them, is competent, not merely in a case where the defendant could not otherwise be convicted, but in all cases, no matter how ample the evidence of identification through other sources may be.

The dying declarations of a murdered man as to the identity of the prisoners are properly admitted in evidence where they give in great detail and particularity the manner in which the deceased was robbed and tortured; the opportunities he had of observing the robbers, so as to enable him to form his belief as to their identity, and conclude as follows: "I am satisfied that the Roddy boys (the prisoners), brought to my house by the officers, are the same men that robbed and tortured me." It is no objection to the admission of such declarations that at the time they were made a mask was put upon the faces of the prisoners so as to leave the same portions of the head and face open for examination as was left of the heads and faces of the robbers on the night of the murder.

*Charge of court—Stating purport of testimony.*

The use in the court's charge of the word "claimed" instead of the word "stated," in referring to the testimony of certain witnesses who saw two men at a certain place, whom they did not then know, but who, they said at the trial, resembled defendants, was not error, where the court was not attempting to give the purport of their testimony, but only referring the jury to the general class of witnesses to which they, among other witnesses, belonged, and referred the jury to their own recollection of the testimony.

*Criminal law—Practice—Motion for new trial—Reviews.*

The refusal of a motion for a new trial is an error in law only where it is apparent that such refusal amounts to a clear abuse of discretion.


Argued Nov. 5, 1897. Appeal, No. 136, Oct. T., 1897, by defendants, from judgment of O. & T. Somerset Co., Dec. T., 1896, No. 2, on verdict of guilty of murder in the first degree. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Indictment for murder. Before LONGENECKER, P. J., of the 16th judicial district, specially presiding.

The facts appear by the opinion of the Supreme Court.

At the trial the commonwealth offered to prove by William J. Horner, the witness on the stand, that on the night of

the burglary at David Berkey's, two of witness's horses were taken out of his stable; that they were led up to David Berkey's house and tied to the fence; that there were two bridles and a saddle and a blanket taken; that by reason of a defect in a foot or the gait of one of the horses he was enabled to track it, and did track the horses in the morning after the burglary for a considerable distance from the point where they were tied, in the direction of Johnstown, by way of a road from Ashtola to Scalp Level, then turning off that road they were found in a field next day. This to be followed with proof that at the point at which the horses were tied they had been fed oats on the ground; to be followed by further proof that parties resembling the defendants were seen at a cut on the Baltimore and Ohio railroad, a little south of Johnstown, being in the direction of their homes in Morrellville, about 6:30 to 7 o'clock on the morning of June 3; that being a point that would be reached by a short cut across the country from the fields in which the horses were found; that he had in his stable, on the night of June 2, leather fly nets; that on the morning of June 3, he discovered the nets had been taken out of the barn, and the straps removed from them, and the balance of the nets dropped under the overshoot of the barn, and that the straps removed from the nets are the straps already testified to by Caroline Berkey as the straps with which her late husband, David Berkey, was tied on the night that his house was burglarized and he tortured.

Counsel for the defendants objected to the foregoing offer for the following reasons: 1. The facts alleged in the offer tend to establish a separate and distinct offense, and therefore are inadmissible in this case. 2. It is not proposed in the offer to prove that the horses, nets and other property designated were at any time seen in the possession of either of the defendants, and therefore they cannot be affected by the proof offered. 3. The fact that the straps or portions of fly nets which were used at the robbery were gotten at the stable of the witness cannot affect the defendants. It is not corroborative proof tending to show that they were the parties, as it is not alleged that the defendants were in possession of the stable or the nets, and it would therefore add nothing to the evidence on the part of the commonwealth tending to identify the defendants as the perpetrators of the alleged crime. The evidence is irrelevant and immaterial.

The Court: The proposed evidence is not, of course, offered for the purpose of establishing a distinct and separate offense, and the mere fact that it discloses a distinct offense does not exclude it. We cannot say at this stage of the case that the proposed proof as to the property mentioned is not material for the purpose of tracing the perpetrators of the crime and connecting the defendants therewith. The evidence is therefore admitted, and exception noted for the defendants.

Under this offer the commonwealth proved that two horses were taken from the stable of William J. Horner the night of the robbery, which were found next day several miles from Berkey's, along the public road, in the direction of Johnstown; but did not adduce any evidence whatever connecting either of the defendants with the taking of the horses. [2]

The commonwealth offered to prove by the witness on the stand that about two weeks before the robbery of June 3, and often before that, he had seen, and, with David Berkey, counted the contents of David Berkey's pocketbook; that the last time he counted it, and frequently for years before, he had seen in the pocketbook a ten dollar Confederate bill; that David Berkey had kept this bill in his pocketbook and frequently exhibited it. This to be followed with proof that on the afternoon of June 3, after the burglary at Berkey's, James Roddy, one of the defendants, exhibited and destroyed, in Morrellville, a bill of like description.

Counsel for the defendants objected to the foregoing offer for the following reasons: 1. The time at which the witness is alleged to have seen a confederate bill and the money in the pocketbook of David Berkey is too remote from the robbery. 2. The offer does not propose to sufficiently identify the Confederate bill for the purpose of making it evidence against the defendant James Roddy in this case. 3. It is not proposed to be shown that the defendants had any knowledge of the money alleged to be in possession of David Berkey at any time prior to the robbery, and they cannot be affected by the knowledge possessed by the witness. 4. The evidence is irrelevant and immaterial.

The Court. We overrule the objection, admit the testimony, and note an exception for the defendant.

Under this offer the commonwealth proved that about two

weeks before the robbery, David Berkey had some money in his pocketbook and a ten dollar Confederate bill which he had carried for a number of years, and Frederick Naugle, Jennie Naugle and Mattie Naugle, were called to prove that James Roddy had a bill of like description in his possession on June 3, a few hours after the robbery. [3]

The commonwealth offered a paper testified to by Dr. Conrad and Dr. Taylor, marked exhibit "A," for identification, as the dying declaration of David Berkey.

Counsel for the defendants objected to this paper for the following reasons: 1. The commonwealth has already introduced the testimony of Caroline Berkey, a witness who was present at the time of the alleged robbery and torture of Mr. Berkey, and as dying declarations are only admissible on the ground of necessity, and the commonwealth has shown that no such necessity exists in this case, therefore the alleged dying declarations of David Berkey are not admissible in this case. 2. The declarant states in the paper nothing upon which the identification of the defendants can be based; and the simple statement contained therein, namely, "I am satisfied that the Roddy boys brought to my house by the officers are the same men that robbed and tortured me," is not a sufficient identification of the persons on trial. 3. The declarant states his belief that the two Roddy boys are the persons who robbed and tortured him, but does not state the facts upon which he founds such belief, whether on knowledge acquired by him on the evening of the assault and robbery or whether on information furnished him by other persons subsequent thereto. 4. The commonwealth has not laid sufficient ground for the introduction of this paper. 5. The evidence already introduced by the commonwealth shows that the officers who had the prisoners under arrest took them to the house and, in the presence of Mr. Berkey, placed masks on them, and that the officer, at the request of Mr. Berkey, got John Roddy to enter into a conversation in the presence of Mr. Berkey, and did such other acts as they had no right to do, under the law, with prisoners in their charge, and which acts render any identification under such circumstances incompetent in the case. 6. The defendants are prepared to prove that masks were placed over the faces of both men, and they were otherwise made to resemble the parties who committed the

assault on Mr. Berkey, at the time that Mr. Berkey saw them under arrest; that this treatment was all by officers who had them in charge at the time.

The Court: We admit the statement of David Berkey, and note an exception for the defendants. [4]

Paper marked exhibit " A " was read to the jury, and is as follows :

" Personally appeared before me, a Justice of the Peace in and for aforesaid county, David Berkey, who being duly affirmed according to law, deposes and says in regard to being robbed; ' the door of my dwelling-house was bursted open on the night of June the 2d, 1896, and two men came into my bedroom; I asked them what they want in here, and one of them said, " Money, by God, and we will have it." Both men had revolvers and said to me, " Do you see these? " I said " Yes." They told me if I had any prayers to say I was to say them that they would shoot me. I told them to shoot, but they did not. Then they tied me, both hands and feet, and carried me out of bed into a rocking chair and hit me on the mouth, knocking a tooth loose, then they ransacked the safe. I told them my money was in my vest; they got it, it was about one hundred twenty-five dollars in paper and silver. They burnt my feet some before getting any money. They continued to burn my feet demanding more money or Government bonds. They first burnt my feet with paper, afterwards with oil-lamps and tallow candle. They ransacked the house from cellar to attic, then they went to the cellar, brought up pies, cakes and milk and eat and drank, then they left my house ; and I am satisfied that the two Roddy boys brought to my house by the officers are the same men that robbed and tortured me.'

" Affirmed and subscribed before me,⎫
this 28th day of Sept. A. D. 1896. ⎬ DAVID BERKEY."
      " SCOTT MURPHY, J. P. ⎭
" Witness : G. E. CONRAD,
      " J. SWAN TAYLOR."

The court charged as follows :

A year ago this hour the community was shocked at the spreading news of a cruel outrage committed the preceding night on David Berkey at his home in Paint township, in the north-

ern end of this county, by a pair of masked burglars who had forced their way into his house shortly after midnight. It is alleged the injuries he then sustained caused his death, which occurred on the 3d of October last. These defendants were suspected of having perpetrated the crime, were arrested, indicted, and are here to answer that charge. The indictment contains two counts, but both relate to the same offense, and charge the defendants with the murder of David Berkey.

Some facts connected with the case are free from controversy. It is not disputed or questioned that on the night mentioned a burglary was committed at the house of the deceased for the purpose of robbing him. Nor is it denied that he was tortured and that he lingered and died in consequence, as the indictment alleges. The disputed question is whether the defendants are the persons who committed the offense. . . .

The testimony shows that after the door was broken open and the parties had entered, they were asked by David Berkey what they wanted and they replied, " Money, by God, and we will have it," and that they then ransacked the house and took all the money they could find. To accomplish their purpose and compel the old man to disclose the whereabouts of his money, he was placed in a chair, his hands and feet tied, revolvers presented to his face with threats of violence ; he was struck on the face while in this position and his feet burned in the horrible manner described by the physicians and other witnesses ; all for the purpose of forcing him to reveal the other money and Government bonds they supposed he had. If this undisputed testimony is believed, the crimes of burglary and robbery were complete.

The burden is on the commonwealth to show affirmatively that those injuries caused his death, or, at least, concurrently with other causes, contributed to his death. It is the first step necessary to a conviction. So your first inquiry will be whether David Berkey died from the effects of the wounds received at the hands of the two burglars. If this is found in the affirmative, then what is the offense committed by the perpetrators of those acts of cruelty ? The commonwealth says it is murder, and so charges it in the indictment. . . .

Did the defendants commit the crime or participate in its commission? That is the real issue for your determination, and

you must decide it from a fair and impartial consideration of all the evidence submitted. . . .

Were James and John Roddy at the Berkey home on the night of June 2, 1896? Are they the two men who tortured and robbed the deceased? If the evidence satisfies you beyond a reasonable doubt that they are the guilty parties it is your duty to say so by your verdict, regardless of the consequences to them which may follow. . . .

We do not propose to review the testimony in detail. It was argued exhaustively and with exceptional ability on both sides during the sessions of the entire day. It is therefore quite familiar to you and fresh in your recollections. But in brief, the theory of the commonwealth is that the defendants, with Richard Jackson, planned this robbery sometime in advance; that they went out into the vicinity of Berkey's residence the week preceding, and on the 26th, 27th and 28th of May, passed about the neighborhood, locating their victim and preparing for the commission of the crime, and that their visits of those days were but preliminary steps to the act of June 2. A number of witnesses appeared who testified to seeing three persons in the vicinity on the days mentioned in May, as well as on June 2, and undertook, with more or less certainty, to identify the defendants as two of them, and Jackson as the other, some being more positive in the identification than others. Besides these witnesses you have also the testimony of Mrs. Berkey, who was in the house when the burglary and robbery took place, and who also undertakes to identify the defendants. Then there is the dying declaration or statement of David Berkey, which was read in your hearing, in which he expresses the belief that the defendants are the guilty parties. [Two witnesses were also called who claimed to have seen the defendants on the morning of June 3, along the B. & O. Railroad, about the Osborne cut, when, it is argued, they were returning to their home. You saw the witnesses on the stand and heard them explain how and why they identified the defendants, and will judge of the value and sufficiency of their testimony for that purpose.] [5] We will only add that this charge must stand or fall, as the identity of the defendants with the persons seen on the road and at Berkey's when the crime was committed, is proved or fails of proof.

The defendants positively deny that they were then, or at any other time before, in Paint township, and deny all knowledge of, or complicity in, the burglary. They say they never knew the deceased and were never at his home until taken there by the officers after their arrest. Even if it should be believed that they were there on May 27, and 28, it would not follow from that fact that they were there also on June 2, and participated in the crime for which they stand indicted. But the evidence as to those two days was offered only as it bears on the nature of their errand and the probability of their return on June 2, and for the purpose of identification. In addition to the positive denial of the defendants they set up what is known in law as an alibi, which means, in plain terms, that when the offense was committed they were elsewhere, and could not, therefore, have done this deed. That defense, when established to the satisfaction of the jury, is as conclusive and complete as any that can possibly be interposed; for a man cannot, in the nature of things, be in two separate places at one and the same time. If on the evening or night of June 2, the defendants were in Morrellville, as they say, it is manifest they could not have been at Berkey's, and are necessarily innocent of this charge. You heard their explanations of how they spent the day of the 2d, going from their home up to Johnstown and returning in the afternoon about 4 o'clock, of the persons whom they met on the way and in Morrellville during the evening and that night, and of their finally retiring and sleeping at their own home that night. A number of witnesses sustain them in their testimony. George Carpenter and Harry Douglass speak of seeing them about 4 o'clock near the Pennsylvania railroad bridge, going in the direction of Morrellville. Mrs. Roddy, Mrs. Lightner, Morris Roddy, Mr. and Mrs. Arnold, Mrs. Green, Mrs. Overdorff, Mr. and Mrs. Dixon, A. J. Leonard and others say they saw them in Morrellville during the evening and night of that day, while Robert Hill says John worked in his mine the next day. If the statements of these witnesses are believed, they would seem to make out a complete alibi. Their credibility, like that of all witnesses in the case, is for the jury. If there are discrepancies in the testimony, it is your duty to reconcile them, if you can, on such theory as will sustain the integrity of all the witnesses who are in conflict. If that cannot

be done, you will consider what opportunities the several wit-
nesses had of knowing, fixing, or remembering the dates and
the facts to which they testified, and on all the evidence deter-
mine who is to be believed.

In setting up the defense of an alibi the defendants introduce
a separate issue into the case, and assume the burden of making
it out to the satisfaction of the jury. Practically all the testi-
mony of the defense is directed to this issue. While it applies
to May 27 and 28 as well as June 2, it is sufficient if it com-
pletely covers that portion of the night of June 2, during which
the crime was committed. For if the defendants were in Mor-
rellville while the crime was being perpetrated, they could not
be convicted for being in Paint township or at Berkey's on the
previous days. In determining the alibi, therefore, only such
testimony on both sides as relates to the afternoon, evening, and
night of June 2, and morning of June 3, should be considered.

The value of testimony depends in some instances on the
ability of the witness to fix satisfactorily the date in question.
Certain witnesses sought to fix dates by associating therewith
other events which were known or were fixed by books or papers.
But, after all, such proof, by association of one fact with an-
other, depends on the memory of the witness as to whether the
fact in issue did, indeed, happen on the same day as the ad-
mitted fact.

The defendants having testified in their own behalf, the com-
monwealth put on the stand a number of witnesses to impeach
their character for veracity, and they said it was not good. It
is proper that we should say such proof does not necessarily
throw the testimony of the defendants out of the case. You
are still to consider, in the light of that proof, whether they
testified truthfully or falsely in the case. It goes to their credi-
bility, and it still remains for you to say how much importance
shall be attached to their testimony.

You have been repeatedly told that no conviction can be had
if, on consideration of all the evidence, including that relating
to the alibi, there is a reasonable doubt of the guilt of the de-
fendants; and such is the law. The presumption of innocence
must prevail unless the evidence removes every fair and rea-
sonable doubt of guilt. It must not, of course, be a mere cap-
tious doubt, but such as your judgment throws into the solution

of the question; a doubt which springs from the evidence submitted, or the lack of evidence; a doubt which touches your conscience and which your reason respects, which, after a fair and candid effort to resolve it and clear it up by the other evidence submitted, continues to cloud your judgment.

Verdict of guilty of murder of the first degree, upon which defendants were sentenced.

*Errors assigned* were (1) overruling challenge for cause of juror, E. B. Maurer, as stated in opinion of Supreme Court; (2–4) rulings on evidence, quoting the bill of exceptions; (5) portion of charge as above, quoting it; (6) in not adequately presenting the evidence on the part of the defendants; (7) in overruling motion for a new trial.

*W. H. Ruppel* and *A. H. Coffroth*, with them *Charles F. Uhl, Jr.*, for appellants.—Where the juror has formed an opinion from hearing or reading the evidence upon a former trial he is incompetent, even if the opinion thus formed does not come up to the standard of a fixed opinion: Staub v. Com., 74 Pa. 458; O'Mara v. Com., 75 Pa. 424; Ortwein v. Com., 76 Pa. 414; Clark v. Com., 123 Pa. 558.

The admission of dying declarations as evidence is an exception to the general rule that excludes heresay evidence; and its admission can be justified only on the ground of absolute necessity: Kerr on Homicide, sec. 413; Wharton's Crim. Ev., sec. 278; Railing v. Com., 110 Pa. 100.

The rule of law is that necessity must not only justify its admission, but that, when admitted, the dying statement must detail facts, and not the opinion or inference of the declarant: Binns v. State, 46 Ind. 311; Wroe v. State, 20 Ohio, 460; Whitley v. State, 38 Ga. 50.

The dying statement as to declarant's belief was not such to which a living witness could testify: People v. Shaw, 63 N. Y. 36; Forbes v. Caruthers, 3 Yeates, 527; Carmalt v. Post, 8 Watts. 406; Kellogg v. Krauser, 14 S. & R. 137; Morse v. State, 6 Conn. 9; Roscoe's Crim. Ev. (8th ed.), p. 222.

The elementary rule is, that dying declarations are only admissible to establish the circumstances of the res gestæ.

The conduct of the officers when the defendants under arrest

were taken to Mr. Berkey for identification, was illegal and invalidated the declarations : Peiffer v. Com., 15 Pa. 470 ; Johnson v. Com., 115 Pa. 388.

In the case of Tietz v. Philadelphia Traction Co., 169 Pa. 516, it was held that the Supreme Court will reverse a judgment where the charge of the court is inadequate and the effect upon the jury misleading.

*Francis J. Kooser*, with him *A. J. Colborn*, district attorney, *L. C. Colborn*, *Ernest O. Kooser*, *Wm. H. Koontz* and *John G. Ogle*, for appellee. Under the facts, the court below was best able to know of the competency of juror Maurer: Ortwein v. Com., 76 Pa. 426 ; Clark v. Com., 123 Pa. 574 ; Com. v. Crossmire, 156 Pa. 309.

It is never irrelevant to give in evidence any circumstance which tends to make the proposition at issue more or less probable : Johnson v. Com., 115 Pa. 394.

The declarations of the deceased were properly admitted : Com. v. Murray, 2 Ash. 41 ; Com. v. Mika, 171 Pa. 273 ; Railing v. Com., 110 Pa. 105.

That a handkerchief was put on the face of John Roddy in the presence of David Berkey after his, Roddy's, arrest, and without objection from him, cannot affect the admissibility of the declaration : Johnson v. Com., 115 Pa. 395.

Considerable latitude and discretion must necessarily be left with the trial judge in commenting upon the evidence ; and unless it is unfair and misleading, we ought not to interfere : Com. v. Doughty, 139 Pa. 397 ; Gehman v. Erdman, 105 Pa. 375.

OPINION BY MR. JUSTICE WILLIAMS, January 3, 1898 :

The evidence before the court and jury on the trial of the defendants in this case disclosed a murder of shocking barbarity and as useless to the murderers as it was cruel. It appeared that the dwelling house of David Berkey and his wife, situated in Paint township, Somerset county, was forcibly entered on the night of June 2, 1896, by two masked men. They demanded money. Berkey and his wife were taken from their bed, bound, beaten and threatened with death if they did not at once tell the place where their money was kept. These modes of persuasion were supplemented by subjecting David Berkey to tor-

ture. Fires made by lighted papers, and afterwards candles and a kerosene lamp, were kept burning under his feet until he was so terribly injured that he died from his injuries within a few months. The murderers secured about $125 in money as the result of their horrible night's work and, after feasting upon such delicacies as the house could afford, in the presence of their victims, they took their departure. So far the facts were not involved in controversy. The burglary, the robbery, the burning which resulted in death were none of them the subjects of doubt or conflict on the trial. The great question about which the controversy raged before the jury was whether the defendants on trial were the persons by whom this succession of crimes had been committed. The commonwealth alleged this to be so and gave a large amount of evidence tending to establish the allegation. The defendants denied all connection with the crimes and all knowledge of them, and endeavored to establish an alibi. A large amount of testimony was given in the effort to satisfy the jury that they were not guilty. The great question in the case was over the identification of the defendants. The course of the trial, the arguments of counsel, and the charge of the learned judge gave prominence to this question, and the verdict is a determination of it adversely to the defendants. On a previous trial, the same question had been contested, and with the same result. This question of fact has been settled therefore by the proper tribunal, and unless the verdict may have been influenced by some mistake of omission or commission on the part of the learned trial judge, it should be allowed to stand, and the defendants should suffer the penalty which the law affixes to the crime of which they have been convicted. The defendants allege that such mistakes were committed at the trial, and have assigned seven errors to the rulings of the trial judge, which we will consider in their order.

1. The first error assigned is to the action of the judge in overruling the challenge for cause made to E. B. Maurer, who was called as a juror, and who was challenged peremptorily by the defendant after the challenge for cause had been overruled. Upon examination on his voir dire the juror stated that he had been present for a day or two as a spectator at a previous trial, and heard a portion of the evidence on the part of the common-

wealth; that he had also read such summaries of the evidence at that trial as had appeared in the local newspapers; and that from what he had so seen and heard, he had formed an opinion in relation to the guilt or innocence of the defendants, and had expressed it to others. He further stated in substance that this was a provisional opinion resting on what he had heard and read, and would not prevent his sitting as a juror at the trial and rendering a verdict in accordance with the evidence submitted. The challenge was a denial of his ability to do what he testified he could do, viz: give to the defendants an impartial trial, and decide upon their guilt or innocence under the evidence in the case. The trier of this issue was the presiding judge. He had seen the juror, his general bearing, the manner of his answers, and he had heard the examination. The question for his decision was "Is it true that this juror stands disinterested, and is able to give the defendants an impartial trial?" He believed the juror, and accordingly held him to be qualified to sit on the trial of the case. Now we cannot bring before us the tones, the manner and apparent spirit and character of this juror, and for that reason we cannot review the influence such considerations exercised upon the mind of the learned judge. We have the answers only. Unless, therefore, the answers were conclusive upon this question, as a matter of law, we have nothing before us on which the assignment can be sustained. But the answers were not conclusive. It is putting their effect as strongly against the juror as we are justified in doing if we say they raised a presumption, prima facie, of bias against the defendants, when they showed him to have formed and expressed an opinion. This presumption was removed if his further answers and his manner satisfied the learned judge that his mind was not fixed in the opinion expressed, but was still open to the influence of the testimony to be offered. The judge was so satisfied. He believed the juror to be capable of divesting his mind of opinions resting on imperfect knowledge of the facts, and judging impartially upon all the evidence that should come before him. We cannot say that he was not justified in reaching this conclusion. Impartiality is not ordinarily occasioned by ignorance. The ability to read periodicals and to think and talk about what one reads is not a disqualification for jury duty. Other circumstances being

equal, it should be regarded as affording some guaranty of fitness. It is prejudgment of the question about to be considered, that disqualifies. If Maurer was able to hear the whole case impartially, and decide it according to the evidence, he was properly qualified to sit as a juror, and the judge was right in overruling the challenge.

2. The next assignment of error complains of the admission of the testimony of William J. Horner. He was the tenant of David Berkey, occupying his farm. In the morning after the robbery, he discovered that his barn had been broken open during the night and a pair of horses, bridles, a saddle and a blanket had been taken away. He also found that the straps had been removed from his fly nets and were not in the barn. The straps were soon after discovered at Berkey's house, where they had been used to bind his limbs while he was undergoing torture. The horses, with the other stolen property, were found later in the morning some eight or nine miles away in a field at the side of a road leading from Berkey's house to the home of the defendants. An examination of the ground about Berkey's home showed that during the night the horses had been tied and fed near by, and had been ridden by the robbers along the highway to the point at which they were found, where it was evident they had been abandoned, their riders completing their journey on foot. The testimony of Horner was offered for the purpose of laying these facts before the jury. It was objected to because it related to another offense than that for which the defendants were indicted, and because it was not proposed to show that the defendants were seen in possession of the horses. But the relevancy of this testimony did not depend on whether it tended to show the commission of another crime, but on whether the facts were so connected with the crime under investigation as to throw any light upon its history. We think it clear that this testimony was explanatory of facts that were before the jury, and that it tended to show how, and by what route, the robbers fled from Berkey's house; and how it was possible for the defendants to have been seen so early in the morning of the 3d of June at points where witnesses placed them, consistently with the allegation of the commonwealth that they were the perpetrators of the crimes at Berkey's house. It was also relevant as showing part of the pertinent history of the crime

under investigation, and the deliberation with which it had been planned in all its details.

The third assignment of error is to the admission of the testimony relating to the possession of Berkey prior to the robbery of a $10.00 confederate note, and the possession on the day after the robbery by James Roddy of a note similar in appearance and of the same denomination, which was carefully destroyed by him. This assignment cannot be sustained. The evidence, together with Roddy's declaration about the bill or note, how he came by it, and why he destroyed it, was relevant upon the question of identity. It was not conclusive upon that question, but it related to it, and with the other facts relating to the same subject was properly submitted to the jury as part of the chain of circumstances tending to identify the defendants as the perpetrators of the crimes committed on the night of the 2d of June.

4. This assignment is directed at the admission of the dying declarations of David Berkey. Six objections, reducible to four, are made against their admission. The first of these alleges that the commonwealth was under no necessity to use the dying declarations and, therefore, had no right to use them. This rests on a misapprehension of the rule relating to their admission. The "necessity" to which the text books and the cases refer is not the exigency of any particular case, but a public necessity which civilized society feels the pressure of, for the protection of human life by the punishment of man slayers. Before the offense of murder is completed, the victim must die. While he feels death to be impending, but while consciousness continues, what he declares as to the origin of his injuries and the person at whose hands he has received them is competent, not in a particular case where the defendant could not otherwise be convicted, but in all cases, no matter how ample the evidence of identification through other sources may be. But the second objection is that "the simple statement contained in the declaration 'I am satisfied that the Roddy boys, brought to my house by the officers, are the same men that robbed and tortured me' is not a sufficient identification of the persons on trial." This objection should be read in connection with the whole statement or declaration as made by Berkey. It runs thus, "Two men came into my bedroom. I asked them what they wanted here, and one of them said 'Money, by God and

we will have it.' Both men had revolvers, and said ' do you see
these?' I said 'Yes.' They told me if I had any prayers to
say, I was to say them, that they would shoot me. I told them
to shoot, but they did not. Then they tied me, both hands and
feet, and carried me out of bed into a rocking chair and hit me
in the mouth, knocking a tooth loose. Then they ransacked
the safe. I told them my money was in my vest. They got it,
it was about $125 in paper and silver. They burned my feet
some before getting my money. They continued to burn my
feet, demanding more money or government bonds. They first
burned my feet with paper. Afterwards with oil lamps and
tallow candles. They ransacked the house from cellar to attic.
They went to the cellar, brought up pies, cakes and milk, and
eat and drank. Then they left my house, and I am satisfied the
two Roddy boys, brought to my house by the officers, are the
same that robbed and tortured me." This is a vivid statement
of the occurrences of that night, showing the opportunity Berkey
had to see his torturers, to know their voices, their figures, their
movements, their eyes, the color of their hair, and their relative
size and manner. Every peculiarity of each of them must have
been literally burned into the memory of both David Berkey
and his wife. They were brought to the house of their victim.
He looked at them to see if they were the same men he had seen
on the night of the 2d of June. His conclusion is "Yes; I am
satisfied they are the same men. My mind is at rest on the sub-
ject. I have no doubt." This was a distinct identification, and
plainly admissible. The third objection is that Berkey gave no
reasons for thinking the Roddy boys were the men who robbed
and tortured him. He gave his opportunities for observing the
robbers on the night of the crime fully. He examined the
Roddy boys, and then he said, " Yes, they are the same." This
was enough. His belief rested on his opportunities for observ-
ing the men, and he gave these fully. The last objection is to
the fact that a mask was put on the faces of the Roddy boys, so
as to leave the same portions of the head and face open for ex-
amination as was left of the heads and faces of the robbers on
that night. This was at the request of Mr. Berkey. He also
desired the defendants to speak. He seems to have desired to
" satisfy " himself upon the question of identity before express-
ing an opinion. The mask was used without objection or re-

monstrance from any one, and apparently with the honest purpose of deciding, after a careful examination, whether the defendants were the criminals by whom the robbery and burning had been committed or not. We do not see that, even if the propriety of the use of the mask on the defendants was questionable, it would be a valid objection to the admission of the dying declarations of David Berkey. It might affect the credit to which it would otherwise be entitled, but not its admissibility. But we are by no means prepared to concede that the use of the mask, under the circumstances, was questionable. The handkerchief fell from the face of one of the defendants on the night of the robbery and remained off for some considerable time. The face of the other was not seen except with the handkerchief upon it. His appearance as they saw him move about with the mask on was fixed indelibly on their minds. It is easy to see that they might be able to identify him much more easily and certainly, if allowed to see him dressed and disguised as he had been during the night of the 2d of June, than by seeing him without disguise, and as they had never before seen him.

The criticism upon the charge of the learned judge which constitutes the fifth assignment of error is merely verbal. Possibly the word " stated " would have been preferable to the word " claimed " in referring to the testimony of the witnesses who saw two persons near the Osborne Cut whom they did not then know, but who they said at the trial resembled the defendants. But the learned judge was not attempting to give the purport of their testimony, only to refer the jury to the general class to which these, among other witnesses, belonged. Their testimony related to the identification of the defendants, and he referred them to their own recollection of the testimony.

6. The learned judge did not undertake to recount the witnesses on either side, or to restate their testimony. The facts had been discussed at great length by counsel, and the evidence had been marshaled in support of their respective theories. It remained only for the court to give appropriate legal instructions and to indicate the questions for the determination of the jury. This was all the learned judge attempted to do, other than to refer in the most general way to the several lines of testimony applicable to the several questions submitted to them. This was carefully and correctly done.

7. The refusal of a motion for a new trial is an error in law only when it is apparent that such refusal amounts to a clear abuse of discretion. This is not alleged in this case, nor do we see any reason why it should be. There was conflict in the evidence. The proper tribunal to settle that conflict and determine where the truth lies is the jury. That tribunal, with the aid of the fullest argument, and an impartial charge, has by its verdict settled the conflict by finding that the defendants were the two men who broke into the house of David Berkey in June last, robbed him of his money, tortured him, and as a result of this torture, murdered him. This is a second conviction. It is based on testimony that if believed justifies the verdict, and we are of opinion that it should not be disturbed because of the reasons presented to us on this appeal.

The judgment is therefore affirmed, and the record remitted for further proceedings according to law.