Commonwealth *v.* Peronace, Appellant.

Argued September 27, 1937.   Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN and STERN, JJ.

*J. A. Welsh,* with him *Eugene Mirarchi,* for appellant.

*Robert M. Fortney,* District Attorney, for appellee.

OPINION BY MR. JUSTICE SCHAFFER, November 12,
1937:

Appellant stands convicted of two homicides, the kill-
ing of his wife and his father-in-law, Vito Mariello.  The
two indictments were tried together.  The jury decided
that the murders were of the first degree and that the
penalty should be death; appellant was accordingly sen-
tenced.

Differences had arisen between the condemned and
his father-in-law and his wife.  She was living apart
from her husband in her father's house.  On the day of
the tragedy, about noon, the father-in-law, the wife and
her small brother, aged eleven, left the house in which

they resided and proceeded to that of appellant, which was close by. Their mission was to interview him about the removal of some furniture from his house. Arriving at his residence, after some parleying, they were admitted. Within the house, an altercation took place between the two men, in which the father-in-law applied opprobrious terms to appellant and struck or pushed him. Appellant testified that the father-in-law, while in the house, threatened to shoot him. There is no evidence beyond appellant's statement that the deceased was armed. No weapon was exhibited in the house or found upon his body immediately after he was killed.

Following the controversy in the house the three persons left by the front door, crossed the porch and descended steps which led to the street. The father and daughter started in the direction of home, the boy in the opposite direction. After proceeding some little distance, the father turned and retraced his steps, the daughter endeavoring to persuade him not to do so. He said something in Italian to the appellant, who was on the porch, and advanced to the gate, whereupon appellant entered the house, procured a revolver, opened the door and began shooting. He fired at least eight bullets into the body of the father-in-law, one of them through his heart, and four into his wife's body. The two fell on the opposite side of the street, fifty-three feet from appellant's house, the daughter on top of her father. He was pronounced dead by the doctor, who arrived on the scene a few minutes after the shooting. The wife lived for several hours but did not regain consciousness. Her death was caused by a bullet which passed through her brain.

A neighbor of appellant, a woman, entirely disinterested, testified that her attention was attracted by the two men arguing in Italian, which she could not understand. She walked to the rear of her lot and saw the wife and her father coming out of the gate leading to appellant's house, appellant was on the porch. The ar-

gument was continuing. The witness turned and walked into her garden, where, a few minutes later, she heard two shots. Quickly running back she saw the father-in-law, lying down "east" of appellant's house, his daughter trying to pick nim up. Continuing her recital, she said appellant "stood right by him [the father-in-law] and he [appellant] fired about five shots . . . right at the body" as "it lay right on the ground." She said the daughter was screaming "Oh, my God! Help! Help!" and "she held her father and said 'Don't shoot, don't shoot.' She left her father go and was jumping all around, and she came close to her husband, and he pushed her and she fell, and he fired the last shot and she fell and was quiet, and he didn't fire any more." Three exploded shells from the revolver were found on the father's body, indicating that appellant must have been close to where he lay when he discharged the shells from the revolver. Other exploded cartridges were found near the bodies. Later four empty shells and an additional magazine clip were found in the yard of appellant's house. The story of the foregoing witness was corroborated in some of its main particulars by the boy before mentioned, particularly as to appellant having come down from the porch and crossed over to where the man's body was lying and there shot his wife. This witness further said that after appellant finished shooting he said to him, "Go tell your mother and see how she likes it." There was also corroboration in particulars by other eyewitnesses.

Appellant pleaded self-defense and his version of the killings varied materially from that of the eyewitnesses. He contended that for years he lived in fear of his father-in-law, who had made threats against his life. He attributed his matrimonial difficulties to Mariello's conduct towards him. He stated that on the day of the killing his father-in-law and his wife entered his home to remove a bedroom suite of furniture, that when Mariello entered he called him vile names and threat-

ened to shoot him with a revolver, which he said Mariello stated he carried in his pocket. Continuing his narration, he said after his wife and Mariello left he returned to the kitchen to prepare his lunch, and after a short lapse of time, glancing out the window, he saw Mariello turn back and open the front gate of his home and proceed up the steps leading to the porch. He noticed his wife attempting to restrain him. As Mariello walked up the steps appellant stated he threatened to kill him. Appellant then became terrorized, secured his gun, proceeded to the front door of his home and shot Mariello, who was then standing on the porch. He admitted firing some eight or nine shots from the porch but denied any knowledge of killing his wife.

Counsel for appellant filed thirty-two assignments of error, all of which are without merit; many of which are trivial in nature. The first five relate to the court's refusal to sustain challenges to certain prospective jurors for cause. It appears that before the jury was chosen appellant was forced to exhaust his peremptory challenges, some of which were utilized to remove prospective jurors after the court had refused challenges for cause. Under these circumstances had the challenges for cause been improperly refused, reversible error would have been committed: *Com. v. Vitale,* 250 Pa. 552, 95 A. 724. The rulings of the trial judge, however, were entirely proper. One of the jurors, Viola Halman, was challenged on the ground that she heard a story of the killings from the father of a boy who had witnessed them, and who was later called as a witness for the Commonwealth. On voir dire examination she denied she had formed any opinion of the guilt or innocence of the accused. The mere fact that a juror has heard a portion of the Commonwealth's evidence is insufficient to disqualify, where the juror denies having formed an opinion on the guilt of the accused: *Com. v. Roddy,* 184 Pa. 274, 39 A. 211. The other challenges, in the main, were based on the fact that the jurors were either rela-

tives of the county detective, who was the active prosecutor in the case, or political allies of the district attorney. All of the jurors stated they had formed no opinion on the case. No sound reason was shown for excluding them. "The test of disqualification is the juror's ability and willingness to eliminate the influence of his scruples and render a verdict according to the evidence, and this is to be determined by the discretion of the trial judge, based upon the juror's answers and demeanor. . . . Nothing short of a palpable abuse of discretion justifies a reversal in passing on a challenge for cause": *Com. v. Gelfi*, 282 Pa. 434, 437, 128 A. 77, 79; *Com. v. Bentley*, 287 Pa. 539, 135 A. 310.

Objection is made to the refusal of the court to allow the appellant forty peremptory challenges. It is argued that as two indictments were tried together, he is entitled to twice the number of challenges ordinarily allowed. The Act of July 9, 1901, P. L. 629, Sec. 1, 19 PS Sec. 811, provides: "In the trial of misdemeanors and felonies, triable exclusively in the courts of oyer and terminer and general jail delivery, the Commonwealth and the defendant shall each be entitled to twenty peremptory challenges." The contention that under the terms of this act the defendant is entitled to forty peremptory challenges, is groundless. No reason or authority has been advanced to justify the position taken. Only one defendant was being tried and only one jury was to be chosen.

Appellant excepted to the action of the trial judge in striking from the record a portion of the testimony of one Grace Varano. She stated that in 1934 she was at the home of the deceased and heard Mariello, with a revolver in his hand, state that he was going upstairs to kill "Tony," meaning appellant. She further stated that someone told her at the time that Tony was upstairs. It was the latter statement that was stricken from the record. This was pure hearsay and properly removed. In view of the witness' other testimony, its ex-

clusion could not have in any way affected appellant. It was immaterial to the purpose for which this testimony was introduced.

The trial judge's action in excluding evidence of an uncommunicated threat against appellant, made an hour before the killing by Mariello, is also assigned as error. The record is replete with other threats made by him against appellant. While it is true that uncommunicated threats may be received as showing the intent of the deceased, from which it may be inferred he was the aggressor: *Com. v. Keller,* 191 Pa. 122, 43 A. 198; *Com. v. Santos,* 275 Pa. 515, 119 A. 596; *Com. v. Tyrrell,* 296 Pa. 332, 145 A. 855, the exclusion of this evidence in the instant case was not error. It was merely cumulative of other evidence received. The testimony of the eyewitnesses, and the position of the empty shells found immediately after the killing, leave no doubt as to who was the aggressor. As is stated in the syllabus in *Com. v. Tyrrell,* supra, "On the trial of an indictment for murder the court cannot be charged with error in refusing to admit uncommunicated threats made by the deceased against the defendant, where they are merely cumulative of numerous threats known to the defendant, and would have added nothing to defendant's conclusion that the deceased had a violent hatred and ill will against him. Such uncommunicated threats could have no bearing as to whether the deceased or the defendant was the aggressor, where the question of who was the aggressor was one, not of inference, but of direct proof by numerous witnesses that defendant was the aggressor."

Shortly after the killings, pictures were taken of the scene of the crime and the position of the bodies. At the morgue photographs were taken of the bodies to show the location of the wounds. These pictures, along with the clothing of the victims, were offered in evidence. Admission of photographs of this nature is a matter for the discretion of the trial judge: *Com. v. Winter,* 289

Pa. 284, 137 A. 261; *Com. v. Ferry,* 326 Pa. 129, 191 A. 130. This same principle is applicable to the introduction in evidence of the victims' clothing. "The admission in evidence of the clothing worn by the deceased for the purpose of showing the location of the bullet holes was within the discretion of the trial judge": *Com. v. James,* 294 Pa. 156, 162, 143 A. 910, 912; *Com. v. Talarico,* 317 Pa. 481, 177 A. 1. The pictures and clothing served a legitimate purpose in aiding the jury in determining the issues in the case, particularly whether appellant acted in self-defense. The number and position of the wounds portrayed by the photographs were a substantial aid to the jury in determining the appellant's guilt. They were offered for a proper purpose and, as we view them, were not calculated to inflame the jury's emotions against appellant. Very recently in *Com. v. Ferry,* supra, we held photographs showing the wounds on the body of a person slain admissible, saying that their reception is within the sound discretion of the trial judge. "*If he believes* [italics supplied] that their effect may be to inflame the jury's emotions against a defendant and their admission is not necessary to show the location of wounds, they should be excluded. Whenever they are received in evidence, the jury should be instructed as to their purpose and cautioned not to permit the photographs to stir up their emotions to a defendant's prejudice." In its opinion the court below states that the pictures told the actual story of the shooting more exactly than testimony could, that they corroborated the Commonwealth's witnesses as to where the shots were fired, and their number, and were admitted as evidence combating appellant's self-defense plea. At the close of his charge the judge told the jury they were to let neither sympathy nor prejudice have a part in their deliberations; he asked counsel whether there was anything further on which they desired him to charge. He was requested by appellant's attorney to add instructions on one legal proposition, but no request was made

as to the photographs. While we think it well for judges to caution juries in cases of this class about photographs, in the manner we pointed out in *Com. v. Ferry,* supra, under the circumstances as they appear in this record, we conclude it was not reversible error to fail so to do.

The Commonwealth proved that the killings were produced by bullets fired from a .32 caliber revolver. The revolver was produced in evidence. Also received in evidence were twelve empty cartridge cases of the same caliber as the revolver. Several of these cases were found in the immediate vicinity of the bodies. Appellant admitted firing eight or nine bullets. In all seven bullets were located. Four of the empty cases were found in appellant's yard and a magazine clip was found in the street two feet from appellant's gate. It was shown that the revolver held eight shells in the magazine and one in the chamber. Counsel for appellant objected to the introduction of the shells, bullets and clip in evidence. They were all found in the vicinity and after the crime. There is no merit in appellant's contention that no proof was offered to show that they came from his revolver. See *Com. v. Karamarkovic,* 218 Pa. 405, 67 A. 650; *Com. v. Lockard,* 325 Pa. 56, 188 A. 755.

Counsel for appellant also objected to the admission in evidence of statements of an expert that a .32 caliber revolver would throw shells eight feet if held in a normal position. The objection is founded on the proposition that there was no specific evidence to show that the appellant held the gun in a normal position. In the absence of evidence to the contrary, appellant having admitted firing the gun, the jury could infer that he held it in a normal position.

It is also contended that the trial judge erred in failing to comment on appellant's right to defend his home from felonious assault. According to eyewitnesses the victims met their death some distance from appellant's

home, and his attack was launched when they were beyond the limits of his property. At no time during the conduct of the trial did appellant advance this defense. There was no request to charge on the point. It is a defense raised after trial, which the evidence does not support. The situation as developed by the evidence did not demand such instructions. When account is taken of who the victims in the tragedy were, appellant's wife and his father-in-law, particularly the wife, what their mission was in visiting his home, and the manner of their killing, it would have been a perversion of the legal principle which the appellant now seeks to invoke to apply it to his conduct in committing the crimes of which he stands convicted. Such instruction is to be given only where the facts require it: *Com. v. McLaughlin,* 163 Pa. 651, 30 A. 216; *Com. v. Johnson,* 213 Pa. 432, 62 A. 1064.

The remaining assignment of error relates to the conduct of the district attorney. The court below found nothing improper in the questions or conduct of the prosecuting officer. "The trial judge is the best authority to state what alleged abusive remarks of counsel consist of, and whether harm was done defendant": *Com. v. Gelfi,* 282 Pa. 434, 439, 128 A. 77. From what is presented in the record, the findings of the trial judge in this connection seem entirely justified.

As it is our duty under the Act of February 15, 1870, P. L. 15, Sec. 2, 19 PS Sec. 1187, we have carefully read the entire record to ascertain whether there are present in the proofs the ingredients necessary to a conviction of murder of the first degree; we find they are present; therefore, the judgment is affirmed.

The record is remitted to the court below for the purpose of execution.