Filed 8/16/22  P. v. Callahan CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> MICHAEL JOSEPH CALLAHAN, <br><br> Defendant and Appellant. | D080019 <br><br><br> (Super. Ct. No. SWF1907227) |

APPEAL from a judgment of the Superior Court of Riverside County, Timothy F. Freer, Judge.  Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, and Melissa Mandel and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

Michael Joseph Callahan was convicted of second degree murder for crashing his car into California Highway Patrol (CHP) Sergeant Steve Licon while driving intoxicated at 65 miles per hour on the shoulder of I-15.  On

1

appeal, Callahan argues: (1) the trial court erred by failing to instruct the jury on the lesser offenses of gross vehicular manslaughter (Pen. Code, § 192, subd. (c)(1)),[1] involuntary manslaughter (*id.*, § 192, subd. (b)), and gross vehicular manslaughter while intoxicated (*id.*, § 191.5, subd. (a)); (2) the trial court abused its discretion under Evidence Code section 352 by admitting a photograph of the victim while alive and autopsy photographs of the victim's uniform, helmet, and body; and (3) the trial court erred by imposing $4,500 restitution fines without determining that Callahan had the ability to pay. We find no error and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Callahan's Prior DUI and Knowledge of Dangers of Driving While Intoxicated*

In 2004, Callahan pled guilty to a prior DUI charge. As part of his sentence, he completed a first offender alcohol program and attended classes sponsored by Mothers Against Drunk Driving. In those classes, people shared personal experiences regarding the dangers of drunk driving, including vivid stories about people who had lost loved ones.

Sometime around 2010, Callahan drove home intoxicated and parked on the curb. He characterized this as a "reality check for [him]." Callahan's wife also warned him about the dangers of drunk driving and told him not to do it.

Callahan had discussed his DUI conviction with coworkers at Costco, where he worked as a manager. About a month before the charged crime, Callahan told a coworker that he was glad the police had stopped him in 2004, " 'as opposed to [him] hurting somebody.' "

---

[1] Further undesignated statutory references are to the Penal Code.

B. *Callahan Gets Intoxicated Celebrating a Job Transfer with Coworkers*

On Saturday, April 6, 2019, Callahan finished his usual early morning shift at Costco and went to Big Al's in Ontario to celebrate a job transfer. Big Al's is a family entertainment center with a sports bar.

Callahan entered Big Al's around 10:35 a.m. and took a seat in the bar area with two coworkers. Several more coworkers arrived later.

Over the next few hours, Callahan consumed approximately three shots of tequila and four 22-ounce beers with high alcohol content. He got progressively more intoxicated and unruly. Among other things, Callahan repeatedly pressed his pelvis against the buttocks of a female coworker, grabbed another female coworker, and had to be restrained from taking food from someone else's table.

At some point before leaving Big Al's, Callahan talked with a coworker about the fact that they both had prior DUIs. They agreed "it wasn't worth it" to drink and drive.

C. *Callahan Insists on Driving Home Intoxicated*

Shortly after 3:00 p.m., Callahan went out to the parking lot with other members of his group. He was visibly swaying. He also had trouble tying his shoe.

Callahan's companions were concerned about the possibility he might try to drive himself home to the Lake Elsinore area, which was about an hour away. One of them, Josue E., asked his girlfriend Jennifer to give Callahan a ride, and she agreed. But Callahan protested, " 'No, I'm fine. I can drive home.' " Josue and another coworker, Cesar V., persisted, telling Callahan, " '[D]on't drive home. You're not safe.' " Callahan did not want to listen.

Josue offered to let Callahan stay at his house or get him an Uber. He asked Callahan to hand over his car keys and said he would call Callahan's

3

wife to come get him. Callahan would not turn over his keys or provide his wife's phone number.

Josue and Cesar walked Callahan over to Jennifer's car. Cesar put his arm around Callahan to make sure he did not fall, since he had already "stumble[d] a few times." Josue and Cesar did their best to coax Callahan into Jennifer's car, but he refused, and instead went back inside Big Al's.

At 3:17 p.m., Callahan reentered Big Al's, swaying as he walked. A minute later, he took food from someone else's table, which resulted in a Big Al's manager ejecting him. The manager could see that Callahan was too intoxicated to drive and urged his friends to take care of him.

Callahan exited to the parking lot, walking with an unsteady gait. Josue and Jennifer were still worried about Callahan driving himself home. Jennifer asked if she could call Callahan's wife or get him an Uber, and she tried in vain to take his keys away. Josue told Callahan, " 'Don't drive,' " and urged him to accept a ride, but he still refused.

Callahan became more belligerent. He snapped, " 'Just leave me alone, bitch. I got it. Take your fucking girlfriend out of here. I don't need you guys. I can fucking drive home by myself.' " Callahan took a swing at Josue, but missed and fell backward to the ground. Josue helped Callahan up and continued trying to convince him not to drive. Callahan insisted he was fine and wanted to prove it by driving to Starbucks. Josue and Jennifer agreed to ride with him. Callahan managed to make a roundtrip drive to a Starbucks in the same parking lot.

After they returned to Big Al's, Callahan continued his verbal abuse, especially toward Jennifer, and he also hit Josue in the head. Josue finally decided " '[e]nough is enough' " and gave up trying to persuade Callahan not to drive. Josue and Jennifer got out of Callahan's car, and he drove off.

4

D. *Callahan Strikes and Kills CHP Sergeant Steve Licon*

Around 3:45 p.m., Callahan drove his Toyota Corolla onto southbound I-15. It was sunny with scattered clouds and "100 percent" visibility. The freeway was clear, and traffic was lighter than usual.

Despite the conditions, Callahan was driving erratically. He alternated between driving too slow or too fast for the flow of traffic, frequently changed lanes, had trouble staying in his lane, straddled lanes, swerved into the median to pass other vehicles, twice nearly sideswiped another car, and repeatedly forced other vehicles to honk or take evasive action to avoid colliding with him, resulting in at least one person calling 911.

At approximately 4:25 p.m., near the Nichols Road exit in Lake Elsinore, Callahan sped up and veered onto the right shoulder of the freeway, with his vehicle partially in the gravel beyond the paved portion of the shoulder. There was no apparent reason for Callahan to be driving on the shoulder. According to one witness, he was "just driving like 60 miles an hour on the shoulder like it was nothing."

Farther ahead, CHP Sergeant Licon had pulled Raymundo R. over onto the southbound shoulder for speeding. Sergeant Licon was off his motorcycle, standing on the shoulder behind Raymundo's car, writing the ticket.

Callahan's car accelerated as it approached Sergeant Licon. While still driving on the shoulder at about 65 miles per hour, Callahan hit Sergeant Licon and crashed into the back of Raymundo's car. The impact sent Sergeant Licon flying 108 feet through the air. He landed face down on the concrete, where he lay unconscious. Later that night, Sergeant Licon died from massive, internal blunt-force trauma to the left side of his body.

5

E. *CHP Investigation Confirms Callahan's Intoxication*

Law enforcement officers contacted Callahan at the scene. Callahan "reeked" of alcohol and had "extremely" red, watery, and bloodshot eyes. The CHP conducted a DUI investigation at the scene, including field sobriety tests and a preliminary alcohol screening test, then arrested Callahan.

Following his arrest, Callahan was taken to a CHP station, where breath and blood samples were collected for blood alcohol content (BAC) analysis. At 7:22 p.m., Callanah's BAC was 0.158 percent. Extrapolating backward, Callahan's BAC was between 0.195 and 0.233 percent when he started driving home, and between 0.188 and 0.218 percent when he crashed into Sergeant Licon. A person is too impaired to drive safely with a BAC of 0.08 percent or above. (See Veh. Code, § 23152, subd. (b).)

Officer Timothy Fenton, a CHP drug-recognition evaluator, performed an assessment of Callahan the same night. Callahan admitted to drinking that day. His speech was slurred, he was sweating, and he still smelled of alcohol. Officer Fenton administered the typical field sobriety tests (i.e., horizontal gaze nystagmus, vertical nystagmus, Romberg balance test, walk-and-turn, one-leg stand, and finger to nose). Based on his investigation, Officer Fenton concluded that Callahan was obviously under the influence of alcohol and could not safely operate a motor vehicle.

F. *Trial Court Proceedings*

Callahan was charged with murder (§ 187, subd. (a)) and personal infliction of great bodily injury in the commission of the murder (§ 12022.7). The amended information alleged that Callahan violated section 187, subdivision (a) "in that . . . [he] did willfully and unlawfully murder STEVE LICON, a human being," without any additional details.

At trial, Callahan asked the court to instruct the jury with CALCRIM No. 590 on the lesser related offense of gross vehicular manslaughter while intoxicated (§ 191.5). The prosecutor objected, and the court declined to give the instruction. Callahan did not request any jury instruction on either gross vehicular manslaughter (§ 192, subd. (c)(1)) or involuntary manslaughter (§ 192, subd. (b)).

The jury convicted Callahan of second degree murder (§ 187, subd. (a)) and found that he personally inflicted great bodily injury (§ 12022.7). The trial court sentenced him to 15 years to life. The court also imposed a $4,500 restitution fine (§ 1202.4, subd. (b)) and a stayed $4,500 parole revocation fine (§ 1202.45).

## DISCUSSION

### I

Callahan first argues that the trial court should have instructed the jury sua sponte on the lesser offenses of gross vehicular manslaughter (§ 192, subd. (c)(1)) or involuntary manslaughter (§ 192, subd. (b)). We disagree.

A. *Gross Vehicular Manslaughter*

A trial court must instruct sua sponte on a necessarily included lesser offense if there is substantial evidence that the defendant is guilty only of the lesser and not the greater. (*People v. Birks* (1998) 19 Cal.4th 108, 118 (*Birks*).) However, a trial court has no sua sponte duty to instruct on lesser offenses that are *not* necessarily included in the charged offense. "Rather, a jury need only be instructed on offenses that the prosecution *actually charged* either explicitly or implicitly (because they were necessarily included within explicitly charged offenses)." (*People v. Hicks* (2017) 4 Cal.5th 203, 211, italics added (*Hicks*).)

To determine whether one crime is necessarily included in another, courts must apply either the statutory elements test or the accusatory pleading test. (*People v. Shockley* (2013) 58 Cal.4th 400, 404.) Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. (*Ibid*.) Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former. (*Ibid*.) In a case like this one, where the accusatory pleading merely incorporates the statutory definition of the charged offense without referring to the particular facts, the court must apply the elements test. (*People v. Robinson* (2016) 63 Cal.4th 200, 207.)

As Callahan acknowledges, the California Supreme Court has ruled that the offense of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)) is not a necessarily included offense of murder. (*People v. Sanchez* (2001) 24 Cal.4th 983, 988-992 (*Sanchez*).) Applying the elements test, the court reasoned that "the statutory elements of murder do not include all the elements of the lesser offense" because "[g]ross vehicular manslaughter while intoxicated requires proof of elements that need not be proved when the charge is murder, namely, use of a vehicle and intoxication." (*Id*. at p. 989.)

The reasoning of *Sanchez* applies equally to gross vehicular manslaughter under section 192, subdivision (c)(1). The statutory elements of murder do not include all the elements of gross vehicular manslaughter because gross vehicular manslaughter requires proof of an element not required for murder, namely, "driving a vehicle." (§ 192, subd. (c)(1).) Under *Sanchez*, therefore, gross vehicular manslaughter is not a lesser included offense of murder under the elements test. (*People v. Bettasso* (2020)

49 Cal.App.5th 1050, 1057-1060; *People v. Wolfe* (2018) 20 Cal.App.5th 673, 685-686 (*Wolfe*).)

Callahan argues at great length that *Sanchez* was wrongly decided, but he acknowledges that we are bound by the Supreme Court's decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity*).) We therefore join our colleagues in *Bettasso* and *Wolfe* in holding that gross vehicular manslaughter is not a lesser included offense of murder under *Sanchez*. For this reason, the trial court committed no error by failing to instruct the jury sua sponte on gross vehicular manslaughter.

B. *Involuntary Manslaughter*

Involuntary manslaughter (§ 192, subd. (b)) is ordinarily a lesser included offense of murder. (*Sanchez, supra*, 24 Cal.4th at p. 988.) But the relevant Penal Code section on involuntary manslaughter explicitly states: "This subdivision shall not apply to acts committed in the driving of a vehicle." (§ 192, subd. (b).)

Because it is undisputed that Callahan caused the death while driving a vehicle, there was no substantial evidence to support an involuntary manslaughter instruction. (*Wolfe, supra*, 20 Cal.App.5th at p. 686 [in murder case involving drunk driver who killed pedestrian, "the court was prohibited from" instructing on involuntary manslaughter "because the crime does 'not apply to acts committed in the driving of a vehicle' "]; see also *People v. Munoz* (2019) 31 Cal.App.5th 143, 154 ["If a defendant is charged with murder caused by driving a vehicle while intoxicated . . . a trial court cannot give an involuntary manslaughter instruction"].) "The trial court does not have a duty to instruct on a lesser included offense if there is no substantial evidence in support of it." (*People v. Leal* (2009) 180 Cal.App.4th 782, 792.)

Callahan next argues that he was entitled to a jury instruction on the lesser related offense of gross vehicular manslaughter while intoxicated (§ 191.5, subd. (b)). Alternatively, Callahan contends that even if he was not entitled to such an instruction as a matter of right, the court erred by failing to exercise its discretion to give it.

We again disagree. As we have explained, the Supreme Court has ruled that gross vehicular manslaughter while intoxicated is not a lesser *included* offense of murder. (*Sanchez, supra*, 24 Cal.4th at pp. 988-992.) It has also ruled that a defendant has no right to have the jury instructed on a lesser *related* offense over the prosecution's objection. (*Birks, supra*, 19 Cal.4th at pp. 112-113; see also *People v. Taylor* (2010) 48 Cal.4th 574, 622 [refusing to reconsider *Birks*].) Because "gross vehicular manslaughter while intoxicated is a lesser related offense but not a lesser included offense" of murder, the trial court correctly denied Callahan's request to give such an instruction over the prosecutor's objection. (*People v. Alvarez* (2019) 32 Cal.App.5th 781, 790.)

We reject Callahan's argument that the trial court had *discretion* to instruct on a lesser related offense even over the prosecutor's objection. As the Supreme Court has made clear: "California law *does not permit* a court to instruct concerning an uncharged lesser related crime *unless agreed to by both parties.*" (*People v. Jennings* (2010) 50 Cal.4th 616, 668, italics added; see also *People v. Rangel* (2016) 62 Cal.4th 1192, 1230 ["Under *Birks*, 'instruction on a lesser related offense is proper only upon the mutual assent of the parties.' "].) The Supreme Court has reasoned that a different rule "would interfere with prosecutorial charging discretion, essentially allowing the defendant, not the prosecutor, to choose which charges are presented to

the jury for decision[.]" (*Hicks*, *supra*, 4 Cal.5th at p. 211 [discussing *Birks*].) Once again, we are bound by these Supreme Court decisions. (*Auto Equity*, *supra*, 57 Cal.2d at p. 455.)

## III

Callahan argues that the trial court abused its discretion under Evidence Code section 352 by admitting into evidence: (1) a photograph of Sergeant Licon in uniform when he was alive; (2) autopsy photographs showing his uniform and helmet; and (3) autopsy photographs showing injuries to his body. Having reviewed the photographs ourselves, we find no prejudicial abuse of discretion.

Evidence Code section 352 permits a trial court to exclude relevant evidence if its probative value is substantially outweighed by the danger of undue prejudice. The undue prejudice this provision is concerned with is that which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. (*People v. Chhoun* (2021) 11 Cal.5th 1, 29.)

A trial court has broad discretion to weigh the prejudicial effect of proffered evidence against its probative value under Evidence Code section 352. (*People v. Pierce* (1979) 24 Cal.3d 199, 211.) We review such rulings for abuse of discretion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1198.) The trial court's ruling will not be disturbed unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Pineda* (2022) 13 Cal.5th 186, 222.)

We conclude that the trial court did not abuse its discretion by admitting the portrait photograph of Sergeant Licon in uniform while he was alive. The Supreme Court has "permitted similar uses of photographs of victims while alive" for identification purposes. (*People v. Martinez* (2003)

31 Cal.4th 673, 692; see also *People v. Tully* (2012) 54 Cal.4th 952, 1021; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1230.) Even in cases where the defense has "offered to stipulate to identity," photographs of murder victims while they were still alive may be shown to witnesses " 'to establish the witnesses' ability to identify the victims as the people about whom they were testifying.' " (*Tully*, at p. 1021, quoting *DeSantis*, at p. 1230.) The trial court here admitted the photograph for identification purposes, and the prosecutor showed it to one CHP witness to establish the identity of the person he was talking about. Moreover, the jury already knew that Sergeant Licon was a CHP officer, and even defense counsel agreed it was "not the worst photograph, from the defense's perspective." Based on our independent review, we agree with the trial court that the photograph was not of a type which uniquely tends to evoke an emotional bias against the defendant.

The trial court also did not abuse its discretion by admitting the autopsy photographs of Sergeant Licon's uniform and helmet. These photographs were relevant to show the impact to Sergeant Licon's left side and head and to illustrate the collision reconstruction expert's testimony about how Callahan's vehicle struck him. (See *People v. Pollock* (2004) 32 Cal.4th 1153, 1170-1171 [videotape and photographs showing murder victim's wounds "could assist the jury in understanding and evaluating the witnesses' testimony" and "were not inadmissible as being cumulative of the witness testimony they were used to illustrate and support"].) There was nothing gory or inflammatory about these photographs. The photographs of Sergeant Licon's uniform showed minor blood stains on his left sleeve, and the photographs of his helmet showed scrapes and paint transfer from Callahan's vehicle. The trial court reasonably concluded that the probative

value of these photographs was not substantially outweighed by their prejudicial effect.

Finally, the trial court did not abuse its discretion by admitting the autopsy photographs of Sergeant Licon's body and his injuries. These photographs were relevant and admissible to illustrate the pathologist's testimony about Sergeant Licon's injuries and how they caused his death. (*People v. Winbush* (2017) 2 Cal.5th 402, 459; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 423; *People v. Montes* (2014) 58 Cal.4th 809, 862.) They were also probative of the great bodily injury allegation. (*People v. Heard* (2003) 31 Cal.4th 946, 975 (*Heard*).) Autopsy photographs in murder cases "always are disturbing" but the mere fact "that they are graphic and unpleasant to consider does not render the introduction of those images unduly prejudicial." (*Id*. at p. 976.) As the trial court noted, the prosecutor here did not seek to admit any autopsy photographs showing the removal or dissection of organs or other particularly gory images. Our independent review of the few autopsy photographs admitted by the trial court convinces us that "they are not unduly gory or inflammatory" and "do not appear to be of the sort that might inflame a jury." (*Id*. at p. 976-977.)

Callahan contends that the photographs had no probative value because he never contested the fact that he struck and killed Sergeant Licon while driving intoxicated, other evidence confirmed those facts, and his trial counsel expressed a willingness to enter some form of stipulation on these matters. But even if the defendant is willing to stipulate to a victim's identity, injuries, and cause of death, the prosecution is not obligated to accept antiseptic stipulations in lieu of photographic evidence. (*People v. Johnson* (2015) 61 Cal.4th 734, 767; see also *People v. Morales* (2020) 10 Cal.5th 76, 103-104; *People v. Brooks* (2017) 3 Cal.5th 1, 54.) "A trial court

cannot compel a prosecutor to accept a stipulation that would deprive the state's case of its evidentiary persuasiveness or forcefulness." (*People v. Rogers* (2013) 57 Cal.4th 296, 329.)

The older authorities cited by Callahan do not convince us that the trial court abused its discretion. The Supreme Court in *Heard* rejected the defendant's reliance on these same cases, concluding that they "are distinguishable and do not persuade us that the trial court erred in admitting into evidence the photographs in question." (*Heard*, *supra*, 31 Cal.4th at p. 977, fn. 13, citing *People v. Poggi* (1988) 45 Cal.3d 306, 322-323, *People v. Gibson* (1976) 56 Cal.App.3d 119, 134-135, *People v. Smith* (1973) 33 Cal.App.3d 51, 68-69, *People v. Burns* (1952) 109 Cal.App.2d 524, 541, and *People v. Love* (1960) 53 Cal.2d 843, 856.) In *Heard*, the Supreme Court concluded that photographs depicting the crime scene and the murder victim's body were relevant to illustrate and corroborate the testimony of various prosecution witnesses, and were not inadmissible merely because the defendant did not dispute cause of death or the nature and extent of the victim's injuries, or because the photographs were cumulative of facts independently established by the testimonial evidence. (*Heard*, at pp. 972-979.) We reach the same conclusion here.

In sum, we conclude that the trial court reasonably decided that the admitted photographs were relevant and their probative value was not substantially outweighed by their potentially prejudicial effect. Thus, the trial court did not abuse its discretion by admitting these photographs into evidence. (*Heard*, *supra*, 31 Cal.4th at p. 978.)

IV

Finally, Callahan asserts that the trial court erred by imposing a $4,500 restitution fine (§ 1202.4, subd. (b)) and a stayed $4,500 parole

14

revocation fine (§ 1202.45) without making any determination that he had the ability to pay them under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).[2]

We conclude that Callahan has forfeited the ability to pay issue by failing to raise it at sentencing, which occurred nearly three years after *Dueñas* was decided. "The concept of forfeiture for failure to raise ability to pay fines, fees or assessments is well established in our case law . . . ." (*People v. Keene* (2019) 43 Cal.App.5th 861, 864 (*Keene*) [holding defendant forfeited *Dueñas* issue by failing to raise it at sentencing even though he was represented by counsel and "was aware of the recommended amount of money proposed to be assessed against him"].)

Before Callahan's sentencing, the probation department submitted a report and recommendation. The report stated that Callahan made $90,000 per year as a manager at Costco until June 2019, when he resigned. The probation department recommended imposition of a $4,500 restitution fine (§ 1202.4, subd. (b)) and a suspended $4,500 parole revocation fine.

In his written sentencing statement, Callahan "urge[d] the court" not to impose the recommended $4,500 restitution fine because "his family will need every penny they can scrape together over the next several years to attempt to keep the family home and feed and clothe [his] three children." However, Callahan did not argue that he lacked the ability to pay the recommended fine. An attached letter from Callahan's wife stated that she had been employed at Costco for over 15 years.

At sentencing, the trial court imposed the $4,500 restitution fine and a stayed $4,500 parole revocation fine, as recommended by the probation

---

[2]    Other California courts have disagreed with the holding of *Dueñas*, and the issue is currently pending before our Supreme Court. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

department.  Callahan did not argue that he lacked the ability to pay these fines and did not request a hearing on his ability to pay.

By failing to argue inability to pay or request a hearing on it in the trial court, Callahan forfeited the issue.  (*Keene*, *supra*, 43 Cal.App.5th at p. 864.)  Although Callahan did object to the $4,500 restitution fine in his sentencing memorandum, he did so on the ground that his family would need the money, not that he lacked the ability to pay it.  (See *People v. Gonzalez* (2003) 31 Cal.4th 745, 755 [defendant's objection to sentence on one ground did not preserve others for appeal].)  Even before *Dueñas*, defendants had a statutory right to object to a restitution fine over the $300 minimum on the ground of inability to pay.  (§ 1202.4, subd. (c).)  Callahan's "silence [on the ability to pay issue] is a classic example of the application of the forfeiture doctrine relied upon by the California Supreme Court in numerous criminal sentencing cases decided well before *Dueñas*."  (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 [holding defendant forfeited ability to pay argument regarding restitution fine and fees by failing to object at sentencing].)

## DISPOSITION

The judgment is affirmed.


                                                        BUCHANAN, J.


WE CONCUR:



HUFFMAN, Acting P. J.



IRION, J.